SO ORDERED.

Dated: December 28, 2018

Daniel P. Collins, Bankruptcy Judge
_____

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| In re: | Chapter 11 Proceedings |
| Phoenix Heliparts, Inc., | Case No. 2:15-bk-12003-DPC |
| Debtor. | Adversary No. 2:16-ap-00331-DPC |
| Robert Reish, | |
| Plaintiff, | |
| v. | |
| Phoenix Heliparts Inc. Liquidating Trust; Louie Mukai, Trustee, | UNDER ADVISEMENT ORDER |
| Defendants. | [NOT FOR PUBLICATION] |
| Phoenix Heliparts Inc. Liquidating Trust, | |
| Counterclaimant, | |
| v. | |
| Robert C. Reish and Kathleen Reish, husband and wife, | |
| Counterdefendants, | |
| Phoenix Heliparts Inc. Liquidating Trust, | |
| Third-Party Plaintiff, | |
| v. | |
| Ryuko, Inc., a Wyoming corporation, | |
| Third-Party Defendant. | |

1

Before this Court are two claims for relief sought in this adversary proceeding (the "Adversary Proceeding") filed by plaintiff, Robert C. Reish ("Reish"), pertaining to a MD helicopter, model 369FF, serial number 0041FF (the "41FF"). The Counterclaims filed by the defendant/counterclaimant Phoenix Heliparts, Inc. Liquidating Trust (the "Trust") against Reish and his wife (the "Reishes") include a 11 U.S.C. § 549[1] avoidance action coupled with a § 550 award pertaining to the 41FF and a declaratory action concerning a MD 369D helicopter, serial number 1170229D (the "Delta")[2]. In its Third Party Complaint against Ryuko, Inc. ("Ryuko"), the Trust seeks to avoid, under § 548, a note (the "Ryuko Note") executed by Phoenix Heliparts, Inc. ("Debtor") in favor of Ryuko. Also before the Court are claims filed against this bankruptcy estate by Reish and Ryuko and the objections of Louie Mukai ("Trustee") filed against those claims.

The Court now finds that Reish's interest in 41FF is avoidable under § 544. Alternatively, the Court finds that the transfer of 41FF to Reish is avoidable as an unauthorized post-petition transfer under § 549. Reish is ordered to turnover to the Trust the amount of $2,150,000 from his post-petition sale of 41FF to the Azerbaijan Ministry of Defense ("AMOD"). The Court also finds that the obligation incurred in connection with the Ryuko Note is avoidable under § 548.

As to Reish's claims, the Court allows the following general, unsecured claim amounts:

1. Reish's Proof of Claim Number 35 is allowed in the amount of $807,432.

2. Reish's Proof of Claim Number 36 was withdrawn and is therefore $0.

3. Reish's Proof of Claim Number 37 is presently $0 but will be allowed to the extent of Reish's satisfaction of the order to turnover $2,150,000 in sale proceeds.[3]

4. Trustee's Objection to Reish's Proof of Claim Number 38 is sustained and is therefore $0.

5. Reish's Proof of Claim Number 39 is allowed in the amount of $875,000.

---

[1] Unless otherwise indicated, all Section references are to the Bankruptcy Code 11 U.S.C. §§ 101-1532.
[2] Page 3, at footnote 1 of the Joint Pre-Trial Statement references a 629 helicopter. It is believed that the parties are referencing the Delta. It remains a mystery to the Court as to where the 629 numbers come from.
[3] See § IV(A)(5).

## I.  PROCEDURAL BACKGROUND

Debtor filed its voluntary chapter 11 bankruptcy case on September 18, 2015 ("Petition Date"). The Trustee was appointed chapter 11 trustee on October 22, 2015.[4] On May 31, 2015, the Court entered its order confirming Debtor's plan of reorganization.[5]

On July 12, 2016, Reish commenced the Adversary Proceeding by filing the complaint in this bankruptcy case 2:15-bk-12003-DPC against the Trust and the Trustee to determine the ownership interests in 41FF. [6] On July 26, 2016, the Trust and Trustee filed an answer to Reish's complaint, together with a counterclaim and third-party complaint, naming Reish's wife, Kathleen Reish, as a counterdefendant and Ryuko as a third-party defendant.[7] On September 9, 2016, Reish filed an answer to the counterclaim.[8] On September 13, 2016, Ryuko filed an answer to the third-party complaint.[9]

On December 8, 2016, Trustee filed a motion for summary judgment and supporting statement of facts.[10] On January 17, 2017, Reish and Ryuko filed a cross motion for summary judgment and supporting statement of facts.[11] On January 31, 2017, Trustee filed a reply and supporting statement of facts.[12] After oral arguments on May 4, 2017, this Court issued an under advisement ruling that denied Reish's and Ryuko's cross motions for summary judgment and partially granted the Trustee's motion for summary judgment.[13] This Court determined that the transfer of the 41FF from Debtor to Reish was an unauthorized post-petition transfer and ordered that the Trustee recover from Reish the proceeds from the sale of 41FF to a third party.[14]

On May 21, 2017, Reish and Ryuko filed a notice that they were appealing the Court's judgment to the Bankruptcy Appellate Panel for the Ninth Circuit ("BAP").[15] On May 14, 2018, the BAP issued a memorandum ("BAP Memorandum") which determined that material questions

---

[4] See Administrative DE 104.
[5] See Administrative DE 482.
[6] See Docket Entry "DE" 1 this Adversary Proceeding.
[7] DE 6.
[8] DE 19.
[9] DE 20.
[10] DE's 22 and 23.
[11] DE's 30 and 31.
[12] DE's 33 and 34.
[13] DE 42.
[14] *Id.*
[15] DE 48.

Case 2:16-ap-00331-DPC    Doc 163    Filed 12/28/18    Entered 12/28/18 18:22:09    Desc
Main Document      Page 3 of 22

of fact existed.[16] The BAP vacated this Court's judgment and remanded the matter for further proceedings.[17]  Although the BAP Memorandum was appealed and cross-appealed, the parties submitted to the Ninth Circuit a Stipulation to Dismiss their appeals because the Ninth Circuit determined it did not have jurisdiction over these premature appeals.[18]

On October 9, 2018, this Court held a one-day trial.[19] Numerous exhibits were admitted. The Court heard testimony from Reish, the Trustee and Tina Cannon ("Cannon"). On November 2, 2018, Reish and the Trustee filed Post-Trial Briefs[20] and this Court took the matter under advisement.

## II. BAP MEMORANDUM

The BAP Memorandum determined that under A.R.S. § 47-2501 Reish obtained a special property interest in 41FF as a result of 41FF's status as an existing and identified good.[21]  The BAP Memorandum further determined that Reish's special property interest created rights under Arizona law with respect to 41FF.[22]  However, because of the parties' agreement about when title to 41FF would pass, the BAP held that the bankruptcy estate maintained some interest in 41FF under 11 U.S.C. § 541(a)(1).[23]  The BAP Memorandum stated that the bankruptcy court would need to determine on remand which was superior: the Trustee's hypothetical lien interest under § 544 or Reish's special property interest.[24]

## III. JURISDICTION

This Court has jurisdiction over these matters pursuant to 28 U.S.C. §§ 157 and 1334 and Rule 7001(2) of the Federal Rules of Bankruptcy Procedure. The parties also consented to this Court's jurisdiction in their Joint Pre-Trial Statement.[25]

---

[16] DE 93.
[17] *Id.*
[18] DE 104 at 2.
[19] DE 139.
[20] DE's 152 and 154.
[21] *In re Phoenix Heliparts Inc.*, 2018 WL 2107796 at 7 (B.A.P. 9th Cir. 2018).
[22] *Id.* at 8.
[23] *Id.*
[24] *Id. at 9.*
[25] Joint Pre-Trial Statement, DE 132 at 4.

4

## IV.    ANALYSIS[26]

### A.    Interests in 41FF

**1.    The Federal Aviation Act preempts Arizona state law.  Reish's unrecorded special property interest is unenforceable and may be avoided under 11 U.S.C. § 544.**

Although the BAP determined that, under Arizona Law, Reish held a special property interest in 41FF, that special property interest is defeated under the facts before this Court because the Court finds that Arizona law is preempted by federal law.

Reish's special property interest under Arizona law is irrelevant for the purposes of this Order because the Court finds that state law is inconsistent with and preempted by federal law. The doctrine of federal preemption originates from the Supremacy Clause.[27]  The Court must examine congressional intent to determine whether preemption applies.  *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 152 (1982).  Federal preemption of state law can be either express or implied.  Preemption occurs whether Congress explicitly states so in a statute or preemption is implied by the structure and purpose of a statute.  *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992).  Federal preemption applies when state law directly conflicts with federal law.  *de la Cuesta*, 458 U.S. at 153.  Federal regulations may have the same preemptive effect as statutes.  *City of N.Y. v. F.C.C.*, 486 U.S. 57, 63 (1988).

The federal statute at issue is the Federal Aviation Act ("Act").  Section 44107 of the Act directs the Administrator of the Federal Aviation Administration ("FAA") to establish a system for recording "conveyances that affect an interest in civil aircraft of the United States…"[28] Section 40102(a)(6) of the Act defines aircraft as "any contrivance invented, used, or designed to navigate, or fly in, the air."[29]  Section 44108 of the Act provides that until a conveyance that may be recorded under § 44107(a)(1) of this title is filed for recording, the conveyance is only valid against "(1) the person making the conveyance…; (2) that person's heirs and devisees; and (3) a

---

[26] This decision sets forth the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.
[27] U.S. Const., Art. VI, cl. 2.
[28] 49 U.S.C. § 44107(a)(1).
[29] 49 U.S.C. § 40102(a)(6).

5

person having actual notice of the conveyance..."[30]  The Supreme Court interpreted this provision's predecessor holding that it invalidates unrecorded title transfers and requires every aircraft transfer to be evidenced by a recorded instrument before the rights of innocent third parties can be affected. *Philko Aviation, Inc. v. Shacket*, 462 U.S. 406, 409-10 (1983).  The Supreme Court expressly stated that, "[a]lthough state law determines priorities, all interests must be federally recorded before they can obtain whatever priority to which they are entitled under state law." *Id.* at 413.

In the trial before this Court, three aircraft bills of sale were admitted into evidence.[31]  The first aircraft bill of sale is dated July 24, 2009.  It "transfer(s) and deliver(s) all rights, title, and interests in" 41FF from seller, Rotormate, USA, to purchaser, Phoenix Heliparts, Inc.[32]  The second aircraft bill of sale is dated October 27, 2015.  It "transfer(s) and deliver(s) all rights, title, and interests in" 41FF from seller, Phoenix Heliparts, Inc., to purchaser, Reish.[33]  The third aircraft bill of sale is not dated.  It "transfer(s) and deliver(s) all rights, title, and interests in" 41FF from seller, Reish, to purchaser, AMOD.[34]

The aircraft bill of sale that establishes Reish's perfected interest in 41FF was not executed and recorded until October 27, 2015, more than one month after the Debtor filed bankruptcy.  Any transfer of ownership interest to Reish prepetition was unrecorded and therefore avoidable under 11 U.S.C. § 544.  The post-petition recording of the Reish interest is void as it violated the bankruptcy automatic stay.[35]

### 2. Title to 41FF passed after the Petition Date.

If the Act does not apply and Arizona law alone controls, the documentary evidence introduced and testimony elicited at trial leads this Court to conclude that 41FF was purchased by Reish for commercial use, not personal use.

A.R.S. § 47-2501(A) provides:

---

[30] 49 U.S.C. § 44108(a)(1)–(3).
[31] Tr. Ex. 13.
[32] *Id.* at 2.
[33] *Id.* at 3.
[34] *Id.* at 4.
[35] 11 U.S.C. § 362(d)(4).

The buyer obtains a special property and an insurable interest in goods by identification of existing goods to which the contract refers even though the goods so identified are non-conforming and he has an option to return or reject them. Such identification can be made at any time and in any manner explicitly agreed to by the parties. In the absence of explicit agreement identification occurs:

1. When the contract is made if it is for the sale of goods already existing and identified…

A.R.S. § 47-2501(A)(1).

Although identification of existing goods gives a buyer a special property interest in the goods referred to in the contract, it does not shift title to the buyer.[36] Under § 47-2401 title passes to the buyer when seller completes his performance in terms of the physical delivery of the goods unless the parties have expressly agreed otherwise.[37] Where the seller is required to deliver the "document of title" and delivery is to be made without shipping the goods, title does not pass until the seller delivers the "document of title."[38]

The 41FF helicopter purchase agreement ("HPA") between Reish and Debtor was a "non-delivery" contract because Reish was to pick up 41FF at the Debtor's facility in Mesa, Arizona once the work was completed. Delivery was to be made without shipping the goods. The work was never completed. Further, the HPA explicitly addressed Debtor's delivery of the "document of title,":

The SELLER warrants that the title of the [41FF] be will be free and clear of all encumbrances at the time of said delivery of the [41FF] to the PURCHASER and that the FAA Bill of Sale conveying title is executed by a fully authorized person and/or persons.

The bill of sale admitted into evidence by Reish purports to transfer to Reish "the [41FF], and all the right, title, interest, property, claim, and demand of the VENDOR thereto and therein" on February 13, 2014 for $1,395,000.00.[39] Paragraph 14 of the HPA states that the original bill of sale is to "be delivered to the PURCHASER on payment of the balance of the Purchase Price as set out herein."[40]

---

[36] A.R.S. § 47-2501(A)(1).
[37] A.R.S. § 47-2401(2).
[38] A.R.S. § 47-2401(3)(a).
[39] Tr. Ex. H3 at 5-6.
[40] *Id.* at 4.

Reish testified at trial that he did not pay the sum of $1,395,000 on February 13, 2014 and that it was not until April 21, 2015 that the full purchase price was paid to Debtor.[41]  Furthermore, Reish's testimony concerning how he completed his final payment and when he received the bill of sale from Debtor is unconvincing.[42]  Reish testified that he transferred $850,000 to Debtor by wire on April 21, 2015 and directed the Debtor to apply $175,000 to complete his purchase of 41FF and apply $100,000 to complete his purchase of the Delta.[43]  Reish's testimony is not corroborated by the testimony of Debtor's former President, Cannon. Reish also failed to produce any documentary evidence confirming his alleged directions to apply these funds in the manner described. Importantly, Reish's testimony confirmed that the $850,000 was transferred to Debtor in response to Cannon's plea to loan over $2 million to the Debtor to facilitate a purchase of parts inventory at a discount from MD Helicopters, a company that was going out of business.[44]  It would make no sense for the Debtor to apply $275,000 of the $850,000 to credit Reish's purchases when these funds were needed by the Debtor to quickly purchase discounted parts. More significantly, in connection with the loan, Debtor executed the Ryuko Note promising to pay $1,275,000 within twelve months. If the loan to Debtor was only $575,000 ($850,000 minus the $275,000), repayment of $1,275,000 within twelve months was an outrageous loan repayment requirement. If, as Reish testified, the $275,000 was to reduce the Ryuko Note principal balance to $1,000,000 ($1,275,000 minus the $275,000 credits) then why was the Ryuko Note not written to reflect repayment of $1,000,000 not $1,275,000?

Reish's testimony regarding payment of $175,000 to complete the 41FF purchase price and $100,000 to complete the Delta purchase price is not credible. The Court finds that Reish never directed Debtor to apply $275,000 of the $850,000 loan to the purchase price of the 41FF or the Delta.

The Court also finds not credible Reish's testimony that he took possession of the original bill of sale on February 13, 2014.  The Court finds title to 41FF did not pass to Reish on February 13, 2014. Rather, the Court finds the Debtor's bill of sale was executed in Reish's name after the

---

[41] Tr. of Trial at 206, DE 150.
[42] *Id.* at 205.
[43] *Id.* at 169.
[44] *Id.* at 240.

Petition Date. This is consistent with the BAP Memorandum, which determined that Debtor's delivery of the document of title – the FAA Bill of Sale conveying title – did not happen until 41FF was sold to AMOD in November 2015, months after the Petition Date. For these reasons, as of the Petition Date the bankruptcy estate maintained an interest in 41FF by virtue of possession of title.

### 3. Reish Purchased 41FF for Commercial Purposes. His special property interest does not provide him a right of recovery or replevin under Arizona law.

Under Arizona law, a buyer with a special property interest has rights with respect to the identified goods in the contract.[45] Under § 47-2502 the buyer's rights are dependent on the nature of the goods purchased.[46] Under § 47-2502(A)(1), if the goods are bought for personal, family or household purposes, and the seller fails to deliver the goods as required by the contract, the buyer has a right of recovery.[47] Furthermore, if the goods are bought for personal, family or household purposes, the buyer takes the goods free of any security interest created by the seller if that security interest attached to the goods after the goods had been identified in the contract.[48] If, however, the goods are not bought for personal, family, or household purposes, the buyer's right of recovery is dependent on the seller's insolvency within ten days of the time of receiving the first installment of the purchase price.[49]

Under § 47-2716, a buyer with a special property interest has the right of replevin.[50] Where the goods have not shipped, the buyer's right of replevin vests "if after reasonable effort he is unable to effect cover for such goods or the circumstances reasonably indicate that such effort will be unavailing…"[51] In the case of a buyer who purchased the goods for personal, family or household purposes, the right of replevin vests on acquisition of a special property interest and is not dependent on the seller's repudiation or failure to deliver.[52] The statute's express reference

---

[45] See A.R.S. § 47-2502 and § 47-2716.
[46] A.R.S. § 47-2502(A)(1)–(2).
[47] A.R.S. § 47-2502(A)(1).
[48] A.R.S. § 47-2502, cmt. 3.
[49] A.R.S. § 47-2502(A)(2).
[50] A.R.S. § 47-2716.
[51] A.R.S. § 47-2716(C).
[52] *Id.*

to personal, family or household goods suggests that a buyer's right of replevin for goods purchased for commercial purposes does not vest until the seller either repudiates or fails to deliver the goods. This notion is confirmed by Reish in his Post-Trial Brief.[53] Similar to A.R.S. § 47-2502, a consumer buyer who acquires a right of replevin under A.R.S. § 47-2716(c) takes free of a security interest created by the seller if the seller's security interest attached to the goods after they had been identified.[54]

As the BAP Memorandum explicitly noted, the factual determination as to whether 41FF was purchased for personal, consumer or household purposes or for commercial purposes is important because it affects what remedies Reish may or may not have against the Liquidation Trust and whether Reish's interests in 41FF defeat that of the Liquidation Trust.

Although Reish claims 41FF was purchased for personal, consumer or household purposes, Reish's testimony at trial contradicts this contention. First, Reish filed proof of claim number 37 ("Claim 37") on February 16, 2016. When Claim 37 was filed it included a claim for lost rents totaling $162,936.98 related to 41FF. This fact coupled with Reish's testimony concerning how he calculated the $162,936.98 in lost rents persuade the Court that Reish's purpose in purchasing 41FF was to lease the aircraft to third parties.[55] At trial, counsel for Reish explicitly stated that the lost rents portion of the claim was not withdrawn.[56] Reish only withdrew his claim for lost rents in his Post-Trial Brief, asserting that 41FF was purchased for personal, consumer or household purposes.[57] Debtor never filed an amendment to Claim 37.

Reish testified that, after he entered into the HPA, Debtor informed him of another helicopter available for purchase and only then did he decide to sell 41FF.[58] This Court finds Reish's testimony lacking in credibility to the extent his testimony could be construed to state that on February 13, 2014, his purpose for purchasing 41FF was for personal use.[59] Reish testified that he used helicopters similar to 41FF to fly missions for the Hawaiian Sheriff's Office. The

[53] DE 152, page 7, lines 17-18.
[54] A.R.S. § 47-2716(c), cmt. 3.
[55] Tr. of Trial at 173-74, DE 150.
[56] *Id.* at 208-09.
[57] DE 152 at 6 of 12.
[58] Tr. of Trial at 196-97, DE 150.
[59] *Id.*

Court does not find that such missions were for personal, family or household purposes, even if Reish did not charge a fee for his efforts. Reish has the burden of proving that 41FF was for personal, family or household purposes. This Court finds that Reish failed to sustain this burden and 41FF was not purchased for personal, family or household purposes.

11 U.S.C. § 541 defines the bankruptcy estate created upon filing of a bankruptcy and defines what property is to be included within the estate.[60] Under § 541(a)(1), the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case."[61] The HPA specified that title to 41FF did not pass until the FAA Bill of Sale was delivered to Reish. A bill of sale was not delivered to Reish until after the Petition Date. On the Petition Date this bankruptcy estate held an interest in 41FF.

11 U.S.C. § 549 permits a trustee to avoid a transfer of property of the estate that occurs post-petition and which is not authorized by statute or the court. A trustee's authority to avoid such unauthorized transfers protects creditors against unauthorized transfers of estate property. *Schwartz v. United States*, 954 F.2d 569, 574 (9th Cir. 1992). This protection, coupled with the broad definitions of "transfer" and "property of the estate," make § 549 applicable to a wide variety of transfers. *Id.*

In order to avoid a transfer under § 549, a trustee must prove: (1) a transfer occurred, (2) of estate property, (3) after the commencement of the case and (4) that was not authorized by statute or the court. *Fursman v. Ulrich (In re First Protection, Inc.)*, 440 B.R. 821, 827-28 (9th Cir. BAP 2010) (citing 11 U.S.C. § 549). Under § 550(a)(1), once a trustee establishes that a transfer is avoidable under § 549, the trustee may recover, for the benefit of the estate, the property transferred, or the value of such property, from the initial transferee or any subsequent transferee.[62]

Here, the record is clear. On October 27, 2015, a transfer from Debtor to Reish purportedly occurred.[63] The estate maintained an interest in 41FF at least until this time and that

---

[60] 11 U.S.C. § 541.
[61] 11 U.S.C. § 541(a)(1).
[62] 11 U.S.C. § 550(a)(1)–(2).
[63] The Trustee contends that when Cannon signed the bill of sale to Reish post-petition she did not have actual or constructive authority from the Court or the Trustee to do so.

interest was property of the estate on the Petition Date. The transfer of the aircraft bill of sale to Reish occurred after the Petition Date and was not authorized by statute or this Court. This transfer may be avoided under § 549. Under § 550, the Trustee is entitled to recover from Reish the value of the property transferred to him. That value is measured by the transfer of $2,150,000 Reish received from AMOD when he sold 41FF to AMOD.

### 4. The HPA Was a Service Contract. Reish does not have a special property interest under Arizona law.

Although the BAP Memorandum determined that Reish had a special property interest in 41FF under Arizona law, evidence at trial demonstrated otherwise. The UCC applies only to transactions involving goods, not to transactions for services.[64] If the transaction at issue includes both goods and services, most courts seek to determine whether the predominate aspect and purpose of the contract is the sale of goods or the providing of services. *See Bonebrake v. Cox*, 499 F.2d 951, 960 (8th Cir. 1974) (considering whether transaction was within Article 2 of the Uniform Commercial Code and holding that "[t]he test for inclusion or exclusion is not whether they are mixed, but, granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved or is a transaction of sale, with labor incidentally involved"); *Yorke v. B.F. Goodrich Co.*, 120 Ill.App.3d 220 (1985) (applying the dominant purpose test to determine whether contracts are for the sale of goods or services when both are plainly involved).

Arizona courts use the same approach in deciding whether the UCC applies to contracts involving both the sale of goods and services. *Double AA Builders, Ltd. V. Grand State Constr. L.L.C.*, 210 Ariz. 503, 509-10 (App. 2005). The question of whether the goods or services are the predominant purpose of a contract is often a question of fact. *Id.* at 510.

In this case, the HPA was a mixed contract because it involved the sale of an identified and existing good together with services to be provided in restoring that good. The BAP Memorandum determined that 41FF was an existing and identified good. Debtor's primary

---

[64] A.R.S. § 47-2102.

business was repairing and servicing aircraft.[65] Occasionally Debtor would purchase salvaged aircraft and repair them to FAA-certified airworthy status.[66] This type of work was labor-intensive and required providing extensive services.[67]

41FF was a salvaged helicopter that required extensive repairs and service to reach the specifications required by Reish. When Reish and Debtor entered into the HPA in February 2014, 41FF was a shell and did not have several necessary components installed.[68] The parties agree that this shell was purchased by Debtor in 2009 for $100,000.[69] After the HPA was entered into, Reish made modifications to the specific work that he wanted done on 41FF.[70] Reish admitted in his testimony that the scope of work to be done on 41FF changed after entering into the HPA.[71]

Testimony from Cannon demonstrates that the predominant purpose of entering into the HPA was for the Debtor to provide the service of repairing and modifying 41FF. Cannon testified that projects similar to 41FF are "very labor-intensive."[72] Specifically, the work that needed to be done on 41FF was "substantial" and required "thousands and thousands" of hours of labor.[73] Ultimately, Cannon estimated that the $1,395,000 cost stated in the HPA was broken down 70% for labor and 30% for parts.[74]  The Court finds this testimony credible. A portion of the parts would include the 41FF shell bought by the Debtor in 2009 for $100,000. The shell would be 7.27% of the HPA price. All other parts would comprise 20-25% of the HPA price.

The HPA listed a "base project price" of $1,395,000 and a "final payment" of "TBD."[75] Reish's testimony is unconvincing where he indicated that the $1,395,000 price was the final price to be paid and based on the specific work he wanted done to 41FF.[76]  Not only did Reish later contradict this testimony by stating that he made modifications to the work he wanted done on 41FF, but the Court finds more credible Cannon's testimony where she indicated the "TBD"

[65] Tr. of Trial at 20, DE 150.
[66] *Id.*
[67] *Id.* at 105.
[68] *Id.* at 185-86.
[69] Joint Pre-Trial Statement, DE 132 at 5.
[70] Tr. of Trial at 194-95, DE 150.
[71] *Id.* at 195.
[72] *Id.* at 105.
[73] *Id.*
[74] *Id.*
[75] Tr. Ex. H3
[76] Tr. or Trial at 163-64, DE 150.

on the HPA meant that the $1,395,000 purchase price for 41FF was just an estimate that could be increased or decreased based on the final modifications to 41FF.[77]

Although the HPA involved an existing and identified good, the predominant purpose for entering into the HPA was for Debtor to provide services to Reish in the form of extensively renovating, repairing and modifying 41FF. Debtor engaged in this service-oriented business by installing equipment specified by Reish to a salvaged shell of a helicopter. Reish was free to modify the specific repairs and modifications after executing the HPA. The final price for 41FF was "TBD" – to be determined. The HPA was a contract for Debtor to provide services to Reish. Article 2 of the UCC does not apply to this transaction.

### 5. Trustee May Recover $2,150,000 from Reish

As discussed above, the transfer of 41FF to Reish is avoidable under § 544. Alternatively, even if the Act does not preempt Arizona law, the transfer of 41FF is avoidable under § 549. Under § 550(a)(1), a trustee may recover from the initial transferee the property transferred or the value of a transfer avoided under § 544 or § 549.[78] Property recovered under § 550(a) is retained for the benefit of the estate, and becomes property of the estate under § 541(a)(3). *In re Allen*, 768 F.3d 274, 282-84 (3d Cir. 2014). When value of the property is recovered, the term "value" refers to fair market value. *Slutsky v. Michel Tire Co.* (*In re Vann*), 26 B.R. 148 (Bankr. S.D. Ohio 1983) ("the term 'value' connotes market value").

Here, the fair market value of 41FF is determined by the price AMOD paid to Reish.[79] On November 25, 2015, AMOD wired Reish $2,150,000 for 41FF.[80] That money should have gone to the Debtor's estate because it was the Debtor's helicopter. Reish held only an unsecured claim against the Debtor for the amount he had previously paid toward the purchase of 41FF. The Trustee may recover $2,150,000 from Reish. When paid, that amount will be retained for the benefit of creditors of the estate.

---

[77] *Id.* at 98.
[78] 11 U.S.C. § 550(a)(1).
[79] Cannon testified that Reish knew of Debtor's bankruptcy filing before the Reish sale of 41FF to AMOD. The Court need not make a finding in this regard but will simply note it would be quite odd if Reish was not aware of the bankruptcy shortly after it occurred, especially given the level of business between the Reish and the Debtor.
[80] Tr. Ex. 14. See also Joint Pre-Trial Statement, DE 132 at 8.

Claim 37 is Reish's claim pertinent to the purchase of 41FF. While this unamended claim continues to assert an amount owed of $1,747,733.34, the Trustee contends that Reish only paid $1,220,000 towards the purchase of 41FF. The Court, however, need not resolve the discrepancy because Reish sold 41FF to AMOD and received $2,150,000. If that is where the story ended, Reish would have no claim for his purchase of 41FF because he would have realized the full value of 41FF. In fact, he may have received greater than the full value for 41FF since he may not have fully paid the 41FF purchase price. However, as noted above, Reish is ordered to pay the Trustee the full amount he received from AMOD on account of his sale of 41FF to AMOD. Currently, Reish's Claim 37 is $0 but once he pays the Trustee all of or a portion of the $2,150,000 he received from AMOD, Claim 37 will increase dollar for dollar to the extent of his satisfaction of his § 544, § 549 and § 550 liability.

This Court is aware that, after Reish filed Claim 37, he was sued by AMOD[81] in the U.S. District Court for the District of Arizona.[82] AMOD apparently wants to unwind its purchase of 41FF from Reish. If Reish defeats AMOD that cause of action should have no impact on Claim 37. If Reish loses to AMOD and eventually pays that award, he may well have an increased Claim 37. This Court is unaware of the status or timing for resolution of that action so this Court makes no present finding on its impact to claims asserted or which could be asserted by Reish in this bankruptcy case.

### B. The Ryuko Note Represents an Avoidable Transfer Under 11 U.S.C. § 548

Section 548(a)(1)(B) of the Bankruptcy Code permits a trustee to avoid transfers that are constructively fraudulent.[83] To avoid a transfer under § 548(a)(1)(B) a trustee must show that the debtor received "less than a reasonably equivalent value in exchange for such transfer" in addition to showing that the transfer or obligation incurred involved an interest of the debtor in property, occurred within two years of filing of the petition and was made while the debtor was insolvent.[84]

---

[81] See Reish's Post-Trial Brief, DE 152 at 11.
[82] Case 2:17-cv-00598-JZB is a breach of contract case in which Syntelco Limited, on behalf of AMOD, is suing Reish in connection with the sale of 41FF.
[83] 11 U.S.C. § 548(a)(1)(B)
[84] *Id.*

15

Case 2:16-ap-00331-DPC    Doc 163   Filed 12/28/18   Entered 12/28/18 18:22:09   Desc
Main Document     Page 15 of 22

The value of what the debtor received must be analyzed within the context of its net effect on the estate. *In re Flashcom, Inc.*, 647 Fed.Appx. 689 (9th Cir. 2016) (citing *Frontier Bank v. Brown* (*In re N. Merch., Inc.*), 371 F.3d 1056, 1059 (9th Cir. 2004)). Several courts have stated that the determination of reasonably equivalent value must be based upon the "totality of the circumstances" and analyzing the individual facts of the case. *See Grissom v. Johnson, et al.* (*In the Matter of Grissom*), 955 F.2d 1440 (11th Cir. 1992); *Barrett v. Commonwealth Fed. Sav. And Loan Ass'n*, 939 F.2d 20 (3d Cir. 1991) (both sides agreed to use the "totality" test, and the court had no apparent problem with this choice); *Cooper v. Ashley Communications, Inc.* (*In re Morris Communications NC, Inc.*), 914 F.2d 458, 466-67 (4th Cir. 1990) (sympathetic to the "totality" test).

As noted in § IV(A)(2) above, in April 2015, Ryuko wired $850,000 to Debtor. The Debtor executed the Ryuko Note in favor of Ryuko. The terms of the Ryuko Note specified that some of the $850,000 might be credited by Debtor to ongoing and future Ryuko projects. The Ryuko Note called for a payment of $1,275,000 by Debtor to Ryuko no later than April 1, 2016, less than one year after Debtor received the $850,000.

Here, the Note was executed within two years of the Petition Date. The parties stipulated in the Joint Pre-Trial Statement that Debtor was insolvent before the date on the Ryuko Note.[85] The only question for the Court to determine relative to the Ryuko Note is whether Debtor received reasonably equivalent value in exchange for incurring the obligation described in the Ryuko Note.

At trial, the parties stipulated that the Ryuko Note called for an internal rate of return of 50%.[86] The Trustee provided testimony that a reasonable interest rate for a one-year loan would be 15%.[87] Reish's only response to the Trustee's testimony was that loaning Debtor $850,000 required him to sell stocks at a short-term capital gain. Reish demanded that Debtor pay $1,275,000 within a year in order to make up for the increased taxes he would have to pay on his

---

[85] Joint Pre-Trial Statement, DE 132 at 6. See also Tr. of Trial 266-67 (where Reish acknowledges that Debtor was insolvent as a result of the Arizona Superior Court's $26 million plus judgment against Debtor).
[86] Tr. of Trial 48, DE 150.
[87] *Id.* at 38.

short-term capital gains.[88] However, Reish's cost of capital is not a measure of the value received by the Debtor. The Debtor received $850,000 but under the Ryuko Note the Debtor was to pay Reish $1,275,000 in less than one year. No evidence or testimony was presented by Reish to support the claim that a 50% effective interest rate reflected reasonably equivalent value to the Debtor. Reish testified that he saw no reason to think the Debtor was a credit risk when he loaned the $850,000.[89]

The parties stipulated that Debtor provided services to Ryuko in the amount of $90,628.[90] Reish testified at trial that the $90,628 was credited for work done on a helicopter with a serial number 0175FF.[91] In other words, $90,628 of the $850,000 paid to Debtor was not a loan, but rather, represented payment for services provided to Reish by the Debtor. After subtracting $90,628 from the $850,000, the principal is $759,372. 15% interest on this principal for 154 days[92] is equal to $48,059.14. Debtor incurred a $1,275,000 obligation in exchange for $759,372. This obligation was incurred within two years of the Petition Date and while the Debtor was insolvent.

This Court finds that the Debtor did not receive a reasonably equivalent value for incurring the Ryuko Note obligation and such obligation is hereby avoided under § 548(a)(1)(B)(i)(II). The Court finds a "reasonably equivalent value" for the loan would have been no more than $807,432.[93] Although the Court rejects Reish's testimony to the effect that $275,000 of the $850,000 loan was used to complete his purchase of 41FF and the Delta,[94] if Reish's testimony was credible, the value given by Reish for the Ryuko Note would be all the more unreasonable.

Claim 35 is Reish's claim for the unpaid Ryuko Note. Claim 35 is hereby allowed in the amount of $807,432.

---

[88] *Id.* at 241.
[89] Id. at 252.
[90] Joint Pre-Trial Statement, DE 132 at 7.
[91] Tr. of Trial 249, DE 150.
[92] The Note was executed on April 17, 2014 and Debtor filed bankruptcy on September 18, 2014.
[93] The Court reaches this number by adding the principal of $759,372 and the 15% interest earned for 154 days ($48,060).
[94] See § IV(A)(2) above.

## C. **Reish's Proof of Claims**[95]

Reish filed five claims with this Court, namely Claims 35-39.[96] On March 24, 2016, the Trustee generically objected to each of these claims.[97] Reish responded on April 1, 2016.[98] On September 27, 2016, the Trustee filed his Omnibus Claims Objection but at the June 20, 2017 hearing on the Omnibus Objection, counsel for the Trustee noted he was not then addressing the Trustee's objections to Reish's Claims 35-39. Rather, those objections were set for January 8, 2018.

On December 26, 2017, the Trustee filed his Objection to Reish's Amended Claim 39.[99] At the Court's January 8, 2018 claims objection hearing, the parties agreed the Reish claims would be addressed at a continued hearing on April 9, 2018.[100] Thereafter, and pursuant to a stipulated briefing schedule,[101] Reish filed a brief as to Amended Claim 39[102] and the Trustee filed a reply.[103] At the April 9, 2018 hearing, the parties sought and obtained a continuance to July 30, 2018.[104] At the July 30, 2018 hearing the parties sought and obtained a continuance on this claim battle to the October 9, 2018 trial date on the Adversary Proceeding.[105]

The chart below briefly summarizes all of the claims filed or mentioned by Reish.

| Claim Number | Date Filed | Total Claim Amount | Subject Matter | Claim Components |
|---|---|---|---|---|
| 34 | N/A | N/A | Precision Aviation Group, Inc. | Mistakenly referenced in Joint Pre-Trial Statement. |

---

[95] In the Court's May 4, 2017 Under Advisement Ruling, the Court noted a mutuality issue because Reish was not one and the same as Ryuko. At trial, however, Reish testified that Ryuko and Reish were the same. See Tr. of Trial at 236-37, 273. Although Reish concedes Ryuko is his alter ego, the Trustee did not stipulate to this fact. The Court now finds that for all purposes of this Order, Reish and Ryuko are one and the same. That is to say, the Ryuko corporate veil is hereby found to be pierced.

[96] Although the Joint Pre-Trial Statement references Reish Claim 34 on page 7 at □20, it is clear to the Court that the parties meant to reference Claim 35. Claim 34 is a claim filed by Precision Aviation Group, Inc.

[97] Administrative Docket 342.

[98] Administrative Docket 372.

[99] Administrative Docket 631.

[100] Administrative Docket 633.

[101] Administrative Docket 639 and 642.

[102] Administrative Docket 641.

[103] Administrative Docket 643.

[104] Administrative Docket 645.

[105] Administrative Docket 649.

| Claim Number | Date Filed | Total Claim Amount | Subject Matter | Claim Components |
|---|---|---|---|---|
| 35 | 2/16/16 | $909,372 | Ryuko Note | $1,275,000 less $90,628 applied to 41FF parts, less $175,000 applied to 41FF purchase price, less $100,000 applied to Delta purchase price |
| 36 | 2/16/16 | $2,150,000 | 41FF | **WITHDRAWN** |
| 37 | 2/16/16 | $1,747,733.34 | 41FF | $1,395,000 for aircraft never delivered plus $189,763.36 for parts paid for and never installed, plus $162,936.98 for lost rents from 7/22/14 to Petition Date (mistakenly identified as 9/8/15) |
| 38 | 2/16/16 | $241,730.12 | 175FF | $31,201.00 for parts paid but not delivered, plus $27,077.32 for labor overcharge, plus $183,451.80 for lost profits from orally promised delivery date (6/1/14) to Petition Date (mistakenly identified as 9/8/15) |
| 39 (2nd Amended Claim) | 11/28/17 | $1,133,503.80 | 229D (Delta) | $30,445 for parts paid but not installed, plus $975,000 for the Delta purchase price paid for by Reish, plus $23,000 for Debtor's profit on the sale to Winco, plus $105,058.80 from orally promised delivery date (8/19/14) to Petition Date (mistakenly identified as 9/8/15) |

### 1. Claims 35 – 37

The Joint Pre-Trial Statement[106] contains a number of stipulated facts regarding Reish's Claims and also contains a number of allegations to which the parties have not stipulated. At the October 9, 2018 trial, both parties submitted evidence that directly pertains to Claims 35-39. The Court resolved Claim 35 in § IV(B) above. Claim 36 has been withdrawn. The Court resolved Claim 37 in § IV(A)(5) above.

### 2. Claim 38

Claim 38 relates to work the Debtor performed on Reish's 175FF helicopter. The claim is stated in the amount of $241,730.12 but at trial Reish withdrew his parts claim of $31,201 and his lost profits claim of $183,451,80[107] leaving only a $27,077.32 claim for labor overcharges on

---

[106] DE 132.
[107] Tr. of Trial 225, DE 150.

work done on the 175FF.[108] Reish testified that he was to be charged labor at a rate of $85 per hour but thought he was actually charged $100 per hour.[109] Reish could not indicate how many hours were charged to him nor did he introduce any documents tending to support his claim that he was excessively charged for such labor.

A claimant bears the burden of demonstrating his right to allowance of his claim. Here, Reish's testimony was exceedingly vague and uncorroborated. Reish failed to carry his burden of proof on what remains of Claim 38. Claim 38 is denied in its entirety.

### 3. Claim 39[110]

Claim 39 was amended twice, the last time on November 28, 2017. The claim is for $1,133,503.08 and relates to Reish's purchase of the Delta helicopter from Debtor at the agreed price of $975,000. Debtor failed to deliver the Delta to Reish, notwithstanding his payment of $875,000 to the Debtor. Debtor eventually sold the Delta to Winco, Inc. on May 14, 2014 for $998,000.[111] In addition to the $875,00 paid by Reish, he claims A) $100,000 of his $850,000 loan was directed towards completing this purchase, B) he is entitled to Debtor's profits of $23,000 (the sales price to Winco ($998,000) less the price he was to pay for the Delta ($975,000)), C) he is owed for parts paid for but not installed ($30,445) and D) he is owed for lost rental income of $105,058.80. At trial, Reish waived his Delta parts claim. As noted above in § IV(A)(2), this Court finds Reish did not direct $100,000 of his $850,000 loan proceeds to complete his purchase of the Delta. Moreover, at trial Reish withdrew his parts claim of $30,445. Claim 39, therefore, totals $1,003,048.80 if Reish carries his burden of proof on the remaining components of this claim.

Reish claims he is entitled to an award of $23,000 because he was buying the Delta for an amount $23,000 less Winco's price. In essence, Reish claims he should receive this profit margin, not the Debtor. However, Reish acknowledges the specifications called for in his purchase of the

---

[108] *Id.* at 272.

[109] *Id.* at 226.

[110] When addressing issues related to the Delta, this Court is mindful of the BAP's finding that "…any determinations the court made with respect to the Delta are VOID." *In re Phoenix Heliparts Inc.*, 2018 WL 2107796 at 5 (B.A.P. 9th Cir. 2018). That said, this Court's determinations concerning Claim 39 pertain to Reish's claims arising out of his attempted purchase of the Delta, not on the disposition of the Delta itself. This Court does not believe this Order violates the BAP Memorandum admonition.

[111] Tr. Ex. G. See also Second Amended Proof of Claim Number 39 at 6.

Delta are different than the specifications of the Winco purchase. Reish did not identify these differences, no could he identify the value of those differences. Reish failed to carry his burden of proof for his "embezzled profits" claim.

Reish seeks lost rental income at the rate of $272.88 per day or $8,300 per month for the period between when he claims the Debtor orally promised delivery of the Delta (allegedly August 19, 2014) until the Petition Date. The Trustee contends this component of Claim 39 must be denied because paragraphs 2 and 14 of the parties agreement[112] read together, deny Reish's claims for consequential damages. The Court disagrees. Paragraph 2 denies Reish's claims to damages that might be incurred by his sale, use or operation of the Delta but do not deny his claims for the Debtor's failure to deliver the helicopter. However, Paragraph 14 remains a problem for Reish as it notes the entire agreement of the parties is contained in the written agreement dated February 19, 2014. The contract does not have a delivery date. The contract cannot be amended by Reish's alleged oral agreement that delivery was to occur on August 19, 2014, as Reish contends. The Court finds Reish failed to carry his burden of demonstrating that a delivery date was agreed to by Reish and the Debtor.

The Trustee contends Reish has produced no contracts for lease by him of the Delta. This is unsurprising as the Delta was never delivered to Reish. Reish testified that the Delta could have been rented and that $8,300 per month was a conservative estimate of the lease revenue he could have obtained. Reish's testimony is not refuted with contrary market rental price estimates from the Trustee. However, Reish's claimed loss of rents pertinent to the Delta in the amount of $105,058.80 is denied because he failed to prove the existence of a contractual requirement of a date certain for delivery of the Delta. Claim 39 is allowed only to the extent of the $875,000 paid by Reish to purchase the Delta.

## V.  CONCLUSION

For the reasons stated above, the Court makes the following determinations:

1.  Reish's Proof of Claim Number 35 is allowed in the amount of $807,432.

2.  Reish's Proof of Claim Number 36 was withdrawn and is therefore $0.

---

[112] Tr. Ex. G. See also First Amended Proof of Claim Number 39 at 5-9.

3.   Reish's Proof of Claim Number 37 is presently $0 but will be allowed to the extent of Reish's satisfaction of the order to turnover $2,150,000 in sale proceeds.[113]

4.   Trustee's Objection to Reish's Proof of Claim Number 38 is sustained and is therefore $0.

5.   Reish's Proof of Claim Number 39 is allowed in the amount of $875,000.

**IT IS ORDERED** that Reish and the marital community of the Reishes pay $2,150,000 to the Trustee for the benefit of the Trust.[114]

The Trustee is directed to draft and upload a form of judgment consistent with the Court's findings and conclusions.

**DATED AND SIGNED ABOVE.**

COPY of the foregoing mailed by the BNC and/or
sent by auto-generated mail to:

James E. Cross
Cross Law Firm, P.L.C.
1850 N. Central Ave., Suite 1150
Phoenix, AZ 85004

H. Lee Horner Jr.
Goldstein Legal Team, PLLC
5800 Arizona Pavilions Drive, #2665
Cortaro, AZ 85652

Louis Mukai
2600 N. Central Ave., Suite 1820
Phoenix, AZ 85004

---

[113] See § IV(A)(5).
[114] The Court finds no personal, sole or separate liability by Ms. Reish to the Trust.